FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
* MARCH 9, 2026 *
BROOKLYN OFFICE

26-CV-1346
Magistrate Judge Marcia M. Henry

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YURI STARIKOV; SEAWEST, LLC,<br>Plaintiffs,<br>v.<br>THE CITY OF NEW YORK; THE NEW YORK CITY POLICE DEPARTMENT; NEW YORK CITY POLICE COMMISSIONER JESSICA TISCH, IN HER OFFICIAL CAPACITY; CAPTAIN GEORGE NG, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; LIEUTENANT DARREN JOHANSEN, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; ANTHONY MARTELLA, SHIELD NO. 26541, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; JOHN ORTEGA, SHIELD NO. 10354, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; PATRICK OHALLORAN, SHIELD NO. 24107, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; MICHAEL DAVIES, SHIELD NO. 14590, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; ELLIOT RICHARDSON, SHIELD NO. 18019, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,<br>Defendants. | Civil Action No. ____________<br><br>**<u>COMPLAINT</u>**<br><br>JURY TRIAL DEMANDED |

Plaintiffs, Yuri Starikov and Seawest, LLC, by and through their attorneys Law Office of Yuri Starikov, LLC, for their Complaint against above-named defendants, allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## I. PRELIMINARY STATEMENT

1. This civil rights action arises out of the false arrest of the property owner and the managing agent employee in connection with a lawful performance of his duties in providing safe living environment to building residents and lawfully restricting entry to non-resident individuals that have a history of threatening demeanor and property damage at or near the multiple-family dwelling premises.

2. The false arrest by the members of the New York City Police Department ("NYPD") is exacerbated by extraordinary misconduct of its police officers who fabricated false testimony to prosecute a law abiding property owner, who is also a member of the New York and New Jersey State Bars. In addition to the legal harm, property owner sustained permanent physical injuries from NYPD's excessive handcuffing, that was made with malice and without any resistance on

part of the property owner, which damaged property owner's left hand nerve, causing him to live in a state of permanent pain and incapable of performing his duties as a managing agent.

3. Plaintiffs bring this action pursuant to 42 U.S.C. §1983 to redress state action and the deprivation under color of New York state law, statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to Plaintiffs through the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

4. Plaintiffs also bring this action seeking redress under New York State laws.

5. This action further seeks declaratory and injunctive relief brought pursuant to 28 U.S.C. §§2201 *et. seq*. The relief is properly sought, because the complained of NYPD policy, custom, or usage presents a continuing injury and likelihood of additional future injuries.

## II. JURISDICTION

6. This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 to review causes of action brought pursuant to 42 U.S.C. §1983.

7. This Court has jurisdiction pursuant to 28 U.S.C. §1367 to review causes of action brought under New York State laws.

## III. VENUE

8. This Court is a proper venue for this action pursuant to 28 U.S.C. §1391(b)(2), because this Court is located in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## IV. JURY TRIAL DEMANDED

9. Plaintiffs demand a trial by jury on each and every one of their claims as pleaded herein.

## V. PLAINTIFFS

10. Plaintiff, YURI STARIKOV, during all times mentioned in this complaint, was and still is, citizen of the United States, and he resided, and now resides, in the City of New York, County of Queens, State of New York.

11. Plaintiff, SEAWEST, LLC, during all times mentioned in this complaint, was and still is, a limited liability company duly formed under the laws of the State of New York, and having a principal place of business in the City of New York, County of Queens, State of New York.

## VI. DEFENDANTS

12. Defendant, The CITY OF NEW YORK, during all times mentioned in this complaint, functioned as a final policymaker, governing body, and employer of New York City Police Department and its defendant officers. Acting under color of state law, the New York City approved or turned a blind eye to unlawful practices of the New York City Police Department, that forced owners and landlords of the multiple-dwelling walk-up apartments to provide unfettered access of their buildings to non-resident visitors that were acting in bad faith or otherwise refused to follow rules and policies of the building. As a part of their practice, NYPD officers disregarded law of contract, building rules and regulations, and forced landlords and building owners to admit non-resident visitors that were refused entry due to their violations, property damage, breach of peace, and other bad acts. This unlawful policy is *referred to hereinafter as* "non-resident visitor unfettered access policy" throughout this complaint. The City of New York is a proper defendant pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

13. Defendant, the NEW YORK CITY POLICE DEPARTMENT ("NYPD"), during all times mentioned in this complaint, is the municipal arm of the City of New York. Acting under the color of state law, NYPD executed unlawful practices that forced owners and landlords of the multiple-dwelling walk-up apartments to provide unfettered access to their buildings to non-resident visitors that were acting in bad faith or otherwise refused to follow lawful rules and policies of the building. As a part of their practice, NYPD officers disregarded the law of contract, building rules and regulations, and forced landlords and building owners to admit non-resident visitors that were refused entry due to their violations, property damage, breach of peace, and other bad acts.

14. Defendant, JESSICA TISCH, during all times mentioned in this complaint, was the duly appointed and presently acting commissioner of the New York City Police Department. Said defendant is and was at all times relevant herein acting under color of state law in the course and

scope of her duties and functions as a policymaker, officer, agent, servant, and employee of the New York City Police Department, was acting for, and on behalf of, and with the power and authority vested in her by the New York City Police Department, and was otherwise performing and engaging in conduct incidental to the performance of her lawful functions in the course of her duties. Said defendant is being sued in her official capacity.

15. Defendant, GEORGE NG, during all times mentioned in this complaint, was the duly appointed and presently acting Captain of the New York City Police Department, at the 101st Precinct located in Queens, New York. Said defendant is and was at all times relevant herein acting under color of state law in the course and scope of his duties and functions as a policymaker, officer, agent, servant, and employee of the New York City Police Department, was acting for, and on behalf of, and with the power and authority vested in him by the New York City Police Department, and was otherwise performing and engaging in conduct incidental to the performance of his lawful functions in the course of his duties. Said defendant is being sued in both his individual and official capacities.

16. Defendant, DARREN JOHANSEN, during all times mentioned in this complaint, was the duly appointed and presently acting Lieutenant of the New York City Police Department. Said defendant's appointment as a Lieutenant took place on October 30, 2025, just over a month prior to false arrest stated in this complaint. Said defendant's rank was and presently is in probationary status. Said defendant is and was at all times relevant herein acting under color of state law in the course and scope of his duties and functions as officer, agent, servant, and employee of the New York City Police Department, was acting for, and on behalf of, and with the power and authority vested in them by the New York City Police Department, and was otherwise performing and engaging in conduct incidental to the performance of his lawful functions in the course of his duties. Said defendant is being sued in both his individual and official capacities. Defendant's official capacity is invoked with respect to the injunctive and declaratory relief only.

17. Defendants, ANTHONY MARTELLA, Shield No. 26541, JOHN ORTEGA, Shield No. 10354, PATRICK OHALLORAN, Shield No. 24107, MICHAEL DAVIES, Shield No. 14590, ELLIOT RICHARDSON, Shield No. 18019, during all times mentioned in this complaint, were duly appointed and presently acting police officers of the New York City Police Department. Said individual defendants are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees

of the New York City Police Department, were acting for, and on behalf of, and with the power and authority vested in them by the New York City Police Department, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties. Said defendants are being sued in both, their individual and official capacities. Defendants' official capacities are invoked with respect to the injunctive and declaratory relief only.

## VII. FACTUAL ALLEGATIONS

### *A. BRIEF HISTORY OF THE PREMISES*

18. Yuri Starikov, along with other members of his family, purchased the 3-family walk-up apartment building located at 172 Beach 27th Street, Far Rockaway, NY in 2017 and leased the building to Seawest, LLC, whereas the entity would be acting as a landlord and managing agent.

19. Yuri Starikov resided, and continues to reside, on the first floor of the said building, with Seawest, LLC renting the remaining two floors to tenants, with rent proceeds going towards the mortgage, utilities, insurance, and costs of maintenance and repairs. Yuri Starikov maintained and continues to maintain his membership position at Seawest, LLC, performing a wide range of duties including superintendent, concierge, handyman, and accountant of the company.

20. Shortly after purchasing the building, Plaintiffs learned that the Beach 27th block had financially distressed properties with a number of properties – 174, 167 and 150 - occupied by squatters.

21. Plaintiffs learned that squatters would take hold of the premises by either entering illegally (trespass) to an unsupervised building or through subleasing premises from existing occupants, who kept landlord(s)/property owner(s) in the dark. Then, squatters would claim their occupancy rights under the 30-day rule of NYC Admin. Code §26-521, requiring eviction process through the housing court.

22. In Queens County, housing court eviction proceedings take years, during which time original squatters would permit entry to subsequent squatters, making "tag, you're it" endless cycle of eviction proceedings, frustrating lawful eviction process available to landlord(s)/property owner(s).

23. Importantly, Plaintiffs learned that NYPD would side with squatters irrespective of how they entered the premises – legally or illegally – so long as they can provide some modicum of proof of their 30-day presence, such as a USPS stamped letter or even a word of the mouth.

24. Disturbingly, Plaintiffs discovered that some of the squatters, knowledgeable of NYPD squatter-friendly practices, took their squatting activity to the next level. Squatters would search for empty or unsupervised properties, then enter the premises, and establish 30-day presence through USPS mails. With established presence, the original squatter would invite subsequent squatter(s), often for a fee, and move on to the next search. If landlord/property owner shows-up, the squatters would demand money in return for leaving the property.

25. Accordingly, NYPD squatter-friendly practices gave rise to a new industry of professional squatters, who act as an organized group of people profiteering from rent-free hostile occupancies and extorting monies from landlord/property owners in return for leaving.

26. Yuri Starikov was not surprised when, on Beach 27th Street alone, he saw the same squatter faces occupying multiple distressed properties.

### *B. Brief Background Of Plaintiffs' Policies to Countervail Squatters*

27. Against the aforementioned background, Plaintiffs adopted a number of measures designed to countervail hostile takeover by squatters.

28. First, Plaintiffs introduced application procedures, checked backgrounds and conducted personal interviews of all prospective tenants. Second, Plaintiffs required all prospective tenants to execute the lease agreement, whereas a tenant would agree to limitations upon visiting privileges as implemented through lease agreement and building rules of conduct, which would survive the lease agreement and can be amended without tenant's subsequent consent. Third, Plaintiffs installed security cameras throughout the premises' common areas monitoring entrants. Fourth, Plaintiffs installed keyless entry locks, which document entries/exits, and are individually assigned to residents of the building and approved visitors; if residents disclose the code, a new code is provided prior to old one being disabled. Fifth, Plaintiffs set up a concierge desk in the building's lobby, with sign-in protocols, to ensure compliance with building rules of conduct and to prevent unauthorized entries. Sixth, Plaintiffs posted compliance signs on the front door and throughout the building advising prospective entrants of trespass laws, building rules of conduct, and residency status of persons living in the building.

### *C. Brief History of Complainant Who Perpetuated NYPD's False Arrest*

29. From 2017 through 2023, Plaintiffs were relatively fortunate to have tenants that in large part complied with the terms of the lease agreement and followed the building rules of conduct.

30. Plaintiffs' fortune ran out in 2023, when they, for the first time, approved a tenant – Tamarra Haynes – under the New York City CityFHEPS program, who came straight out from the shelter.

31. Almost immediately, Plaintiffs witnessed profanity, disrespectful demeanor toward other residents, violation of smoking policies, property damage, including multiple flooding incidents, unauthorized sharing of access codes. Not a single week went by without Tamarra Haynes violating terms of the lease and the building rules of conduct.

32. Disturbingly, Plaintiffs witnessed Tamarra Haynes acquainting herself with squatters occupying properties on the Beach 27th Street block.

33. On April 1, 2024 and multiple times thereafter, Plaintiffs advised Tamarra Haynes that they will not be renewing the lease agreement, which expires on May 31, 2024 and that she must move out.

34. Tamarra Haynes did not leave the premises. Instead of looking for a new home, she escalated her defiant posture through constant harassment, false reports to NYPD, frivolous HP-Housing lawsuits, and physical violence upon Yuri Starikov.

35. By mid-July 2024, Plaintiffs initiated lawful eviction proceedings in the housing court. The proceedings continue to this day, with housing court extending the stay of eviction for Tamarra Haynes.

36. As the eviction proceedings in the housing court lingered, Tamarra Haynes relied upon her squatter connection to implement aforementioned "tag, you're it" squatter protocols designed to tie-up Plaintiffs in the endless cycle of litigation.

37. On or about October 2024, Tamarra Haynes unlawfully subleased Plaintiff's premises to an individual who threatened violence upon Yuri Starikov. The same individual confessed to paying rent to Tamarra Haynes, but was advised that such rent is illegal and that Plaintiffs would regard his continued presence as being a trespasser.

38. On or about May 2025, Tamarra Haynes started to invite another individual on a daily basis. The individual would come inside, spend nights, bring bags of clothing, and otherwise demonstrating his intention to become a permanent resident. Yuri Starikov recognized that individual as a squatter who occupied other properties on Beach 27th Street block. Before 30-day period ran out, Plaintiffs denied entry to that individual thereby preventing him from claiming squatter rights occupancy.

39. On or about August 2025, Tamarra Haynes invited another individual to the premises. As with the previous person, Yuri Starikov recognized that individual as a squatter who occupied other properties on the Beach 27th Street block. The individual and Tamarra Haynes stood in front of the building and discussed a step-by-step plan of killing Yuri Starikov. Thereafter, Plaintiffs denied entry to that individual as well.

40. On or about October 17, 2025, Tamarra Haynes invited Sharon Smitherman-Roach to the premises. Together, both individuals engaged in a harassment campaign ending in Tamarra Haynes demonstrating her middle finger and Sharon Smitherman-Roach damaging the Plaintiffs' property. Sharon Smitherman-Roach further called out other building resident to come outside with unknown intentions, leaving that resident threatened. Later, on December 13, 2025, Smitherman-Roach would intentionally damage Yuri Starikov's car by scratching its rear door.

41. As a result of Sharon Smitherman-Roach threatening demeanor and damage to Plaintiffs' property, coupled with Tamarra Haynes history of illegal subleasing and invitation of potential squatters, Plaintiffs denied entry to Sharon Smitherman-Roach.

### *D. DECEMBER 12, 2025: THE DAY OF THE FALSE ARREST*

#### *D(i). Morning Trial at the Housing Court*

42. The morning of December 12, 2025, started in the housing court, where Plaintiffs were defending themselves from another series of false and damaging allegations that they changed the entry code without notice and allegedly prevented Tamarra Haynes from entry. By that time, Seawest, LLC already had an order of possession and warrant for eviction against Tamarra Haynes, making very little sense for Plaintiffs to engage in the alleged illegal lock-out. Plaintiffs presented evidence of Tamarra Haynes prior allegations of lock-out that were confirmed to be false. On the cross-examination, Tamarra Haynes admitted to knowing and using the code in place, and that code never changed. Moreover, Tamarra Haynes had the opportunity to receive

and accept the code during a prior housing court appearance on December 1, 2025: first, during conference with the court attorney, when Yuri Starikov offered the code; second, on record before Hon. Shorab Ibrahim, when Yuri Starikov again offered the code; and third, within the court premises before and after legal proceeding, when Tamarra Haynes encountered Yuri Starikov in the hallway. All times, Tamarra Haynes had opportunity to ask and receive the code, but did not use the said opportunities to do so and did not accept Yuri Starikov's invitation. The transcript of the December 1, 2025, proceeding documenting the same is accessible through New York State Unified Court System ("NYSCEF") under Index No. LT-311936-25/QU, Doc. No. 78. Notwithstanding the foregoing, housing court ordered Plaintiffs to provide the code by 3:00 p.m. of that day. The said order is accessible through NYSCEF under Index No. LT-002275-25/QU, Doc. No. 10, and is *referred to hereinafter as* "12/12/2025 Housing Court Order."

***D(ii). Plaintiffs' Compliance with the Court Order***

43. Yuri Starikov immediately went back to the premises to ensure compliance with the 12/12/2025 Housing Court Order. On or about 12:22 p.m. Yuri Starikov arrived to the premises and re-printed code assignment notification that had been in place. Yuri Starikov waited for Tamarra Haynes until about 1:06 p.m., at which point he left the premises to run other errands before the 3:00 p.m. deadline.

44. On or about 3:00 p.m. Yuri Starikov returned to the premises. Tamarra Haynes was present in a car in front of the building and was accompanied by her son, Sharon Smitherman-Roach and an unidentified man. Yuri Starikov parks his car about 50 feet away and asks his wife, who is present with him in the car, to wait in the car in order to avoid any provocations.

45. Yuri Starikov comes in front of the building, pulls out the notification with the code, and gives the code to Tamarra Haynes. Since the code is restricted to residents only, Yuri Starikov asks Sharon Smitherman-Roach to step back and not view the code.

46. Tamarra Haynes accepts the code notice, successfully enters the code, and steps inside the building. At this point, Plaintiffs complied with the 12/12/2025 Housing Court Order, and this should have been the end of the story. However, the sequence of events that followed, explains the rationale behind false lock-out allegations, that being a prelude to setting up the stage for Yuri Starikov's false arrest.

***D(iii). 12/12/2025 Housing Court Order Post-Compliance Instigation of Scandal by Tamarra Haynes, her son, Sharon Smitherman-Roach, and Unidentified Man***

47. After making an entry inside the building, Tamarra Haynes, invites Sharon Smitherman-Roach to come inside. For aforementioned reasons, Yuri Starikov denies entry to Sharon Smitherman-Roach.

48. On or about 3:01 p.m., Sharon Smitherman-Roach begins to speak to Yuri Starikov in an elevated voice placing her telephone camera very close to the face of Yuri Starikov and demanding entry. In the meantime, Tamarra Haynes steps outside of the building.

49. On or about 3:02 p.m., Yuri Starikov again declared that Tamarra Haynes and her son are allowed to come in. Tamarra Haynes' son comes out from the car, but is directed by Sharon Smitherman-Roach to go back inside the car.

50. Yuri Starikov, calmly, explained to Sharon Smitherman-Roach that she may not enter due to her past threatening demeanor, breach of peace, and property damage. In response, Sharon Smitherman-Roach called Yuri Starikov a "barefaced liar."

51. On or about 3:06 p.m., Yuri Starikov again stated that Tamarra Haynes and her son can come in.

52. On or about 3:07 p.m., Yuri Starikov stated to Tamarra Haynes: "I suggest it is in the best interest that you step inside." Sharon Smitherman-Roach also asked Tamarra Haynes to "go ahead in."

53. On or about 3:08 p.m., Tamarra Haynes goes back inside the building, for the second time, this time accompanied by her son. Again, Plaintiffs complied with the 12/12/2025 Housing Court Order. Since the same access code is applicable to both, front door and apartment door, Yuri Starikov accompanies Tamarra Haynes to avoid any further false allegations of lock-out involving apartment door.

54. On or about 3:09 p.m., Tamarra Haynes enters the code and opens the apartment door, and enters the apartment she occupies.

55. In the meantime, Sharon Smitherman-Roach and an unidentified man approach Yuri Starikov's vehicle, where his wife is peacefully sitting and avoiding contact. Sharon Smitherman-Roach initiates contact with Yuri Starikov's wife and begins circling the vehicle,

writing down the identifying information. The next day, Sharon Smitherman-Roach will use that information to scratch the vehicle's rear door.

56. Sharon Smitherman-Roach and an unidentified man continue to provoke Yuri Starikov's wife by circling around the vehicle, taking videos. When Yuri Starikov's wife asks them to move away, Sharon Smitherman-Roach and an unidentified man start to engage in the screaming contest. Yuri Starikov comes out and asks his wife to sit in the car and not to respond to provocations.

57. On or about 3:14 p.m., Tamarra Haynes leaves the apartment and joins Sharon Smitherman-Roach, unidentified man, and her son in a harassment campaign against Yuri Starikov's wife.

58. Yuri Starikov asks Sharon Smitherman-Roach to step away from his wife, while his wife is also requesting the same. Sharon Smitherman-Roach returns to the front of the building, justifying her actions as those in response to Yuri Starikov's wife recording from the car parked 50 feet away.

59. On or about 3:15 p.m. through 3:17 p.m., Tamarra Haynes' son – a teenager having an approximate height and weight of Yuri Starikov's wife - goes back to Yuri Starikov's car and continuously approaches his wife in a threatening manner, as he had done before on October 17, 2025.

60 Provided the history, Yuri Starikov runs in between and uses his body to prevent an altercation. Tamarra Haynes and Sharon Smitherman-Roach catch up, screaming at Yuri Starikov and his wife. By this point – 3:16 p.m. – it is clear that false allegations of lock-out had a sole purpose of creating a scandal and to provoke Yuri Starikov and his wife to step outside of legal meets and bounds; a provocation, which both Yuri Starikov and his wife declined to accept.

61. Until about 3:20 p.m., Tamarra Haynes, her son, Sharon Smitherman-Roach, and unidentified man, linger around Yuri Starikov's car and continue speaking in an elevated voice. Throughout all these times, Yuri Starikov and his wife repeatedly demand to end harassing behavior and step away from his wife's vicinity.

62. On or about 3:20 p.m., Sharon Smitherman-Roach calls the police.

63. By about 3:22 p.m., Tamarra Haynes, her son, Sharon Smitherman-Roach, and unidentified man move to the sidewalk on the opposite side of the street, making a safe passage for Yuri Starikov's wife to enter her home.

64. As Yuri Starikov's wife proceeds to her home – on or about 3:23 p.m.- she overhears false reporting being made to 911 operator by Sharon Smitherman-Roach, whereas Tamarra Haynes was not allowed entry. Yuri Starikov clarifies again that entry restriction pertains only to Sharon Smitherman-Roach. In response, Tamarra Haynes and her son charge at Yuri Starikov's wife again, causing him to use his body as a barrier to prevent violence yet another time.

65. On or about 3:23 p.m., Sharon Smitherman-Roach begins waiving hands at Yuri Starikov's wife, making unwelcome comments about personal family matters stating: "Go have a baby." Yuri Starikov responded stating "that is none of your business," and requested to "keep personal life out." Yuri Starikov further reiterated to Sharon Smitherman-Roach that she is not welcome at the premises.

### *D(iv). Arrival of New York City Police Department Officers*

66. On or about 3:41 p.m., first responding officers arrived to the premises. These officers were Anthony Martella and John Ortega. Tamarra Haynes is a first person to speak to the said officers.

67. On or about 3:42 p.m., Tamarra Haynes states to Anthony Martella and John Ortega that Yuri Starikov gave her the code to enter the apartment and shows the 12/12/2025 Housing Court Order. Tamarra Haynes further states that she was going to go with her mother [Sharon Smitherman-Roach]. Then, Tamarra Haynes falsely states that "he [Yuri Starikov] blocks me inside." Tamarra Haynes further states that "she has a restraining order," misrepresenting to police officers that the order is against Yuri Starikov. In fact, the restraining order is <u>for</u> Yuri Starikov against Tamarra Haynes. Tamarra Haynes further stated to officers that her son was inside as well. Both police officers examine housing court order and restraining order.

68. Accordingly, from the first minutes of interaction, Anthony Martella and John Ortega were informed by Tamarra Haynes herself, that Yuri Starikov gave her the entrance code and that she made entry with her son inside, in compliance with 12/12/2025 Housing Court Order.

69. Thereafter, on many occasions, Yuri Starikov advised Anthony Martella and John Ortega that Tamarra Haynes and her son are allowed to enter, and have always been allowed to enter the premises, because they occupy the apartment.

70. On or about 3:43 p.m. Yuri Starikov states to Anthony Martella and John Ortega "no problem, she [Tamarra Haynes] is in, she has a minor child, minor child can come in."

71. On or about 3:46 p.m. Yuri Starikov again states "she [Tamarra Haynes] can come in, she has a minor child, no problem."

72. If there was any doubt or possibility of misunderstanding by Anthony Martella that Yuri Starikov prevented Tamarra Haynes and her son from entering the residence, the doubt was removed with the arrival of NYPD officers Patrick Ohalloran and Michael Davies on or about 3:49 p.m.

73. On or about 3:49 p.m., Anthony Martella said to Patrick Ohalloran: "she [Tamarra Haynes] wants to get inside and he [Yuri Starikov] won't let her in." Yuri Starikov responds that "she [Tamarra Haynes] can come in." It appears that Anthony Martella misunderstands the situation. Yuri Starikov clarifies "she can come in." Anthony Martella responds: "so she can come in?". Yuri Starikov answers: "Yeah". Anthony Martella: "you just don't want her mother to come in?" Yuri Starikov responds: "Mother, father, they are not coming in, yeah."

74. On or about 3:51 p.m. - 3:52 p.m., Anthony Martella again, in the presence of Patrick Ohalloran and Michael Davies, clarified the issue: "So you have no problem with her coming in right now?" Yuri Starikov responded: "I can't, I can't by law not to tell her not to come in. I can't do that. You guys should arrest me if I do that. And I am a lawyer, New York State and New Jersey. To me it is not just empty words, because if I am getting arrested, walking in the handcuffs, I have to explain to the bar what happened, because the charge, you know this is no joke."

75. On or about 3:56 p.m., John Ortega returns to speak to Yuri Starikov, to whom Yuri Starikov states: "So she [Tamarra Haynes] can come in, but her mother can't. I have a right to safety too."

76. By about 3:57 p.m., it is clear to all four officers – Anthony Martella, John Ortega, Patrick Ohalloran, Michael Davies – that Tamarra Haynes and her son's entry is not the issue. Yuri Starikov complied with 12/12/2025 Housing Court Order, provided Tamarra Haynes with an access code, and Tamarra Haynes and her son made unimpeded entries inside the apartment they occupy.

77. On or about 4:05 p.m., two more NYPD officers approach Yuri Starikov: Lieutenant Darren Johansen and Elliot Richardson. Anthony Martella, John Ortega, Patrick Ohalloran, Michael Davies are present during the dialogue between Yuri Starikov and Darren Johansen.

78. Yuri Starikov explains to Darren Johansen that Tamarra Haynes' tenancy expired, and she remains on the property in the status of an occupant, that Tamarra Haynes always had a code, and was provided a copy at 3:00 p.m. in compliance with 12/12/2025 Housing Court Order. Yuri Starikov reiterates to Darren Johansen, as he did to other officers, that he never precluded Tamarra Haynes from entering the building.

79. In response, Darren Johansen insisted that Yuri Starikov provide Tamarra Haynes with another copy of the code, or otherwise Darren Johansen will arrest Yuri Starikov. Anthony Martella, John Ortega, Patrick Ohalloran, Michael Davies silently stood by while knowing that Tamarra Haynes had the code, accessed the apartment, and has no further restrictions upon access. Yuri Starikov provided another copy of the notice page with the code to Darren Johansen.

80. On or about 4:10 p.m., Darren Johansen takes the copy of the code notice and delivers the same to Tamarra Haynes. Then, Darren Johansen advises Yuri Starikov to go inside his apartment due to mistaken belief that Tamarra Haynes has order of protection against Yuri Starikov. On or about 4:11 p.m. Darren Johansen states: "So we have facility, so I would say that the best bet here to avoid further legal action, because she does have a restraining order and you have a restraining order, right you both have restraining orders?" Yuri Starikov: "No, I don't have a restraining order * * *. Darren Johansen: "So she has one against you?" Starikov: "No, no, so she physically assaulted me, then she got ROR [release on recognizance], she got restraining order on that."

81. Importantly, on or about 4:11 p.m., Yuri Starikov, just moments before Darren Johansen ordered the arrest, Yuri Starikov reiterated: "No, no, I am not stopping her from entering."

82. Anthony Martella drafted the criminal complaint, under penalty of perjury, which had a plethora of false statements.

83. While not stated in Anthony Martella's complaint, and the real reason for the arrest, is the policy of the New York City Police Department, forcing homeowners and managing agents of multi-family walk-up apartment buildings to provide unfettered access to non-resident visitors ("non-resident visitor unfettered access policy").

84. NYPD's "non-resident visitor unfettered access policy" flat out rejects any building access controls by homeowners or managing agents, irrespective of the prospective visitor background, adopted building rules, or contractual restrictions.

85. NYPD' "non-resident visitor unfettered access policy" posture is summed up by statements made by John Ortega to Yuri Starikov.

86. On or about 3:43 p.m., John Ortega states to Yuri Starikov that the 12/12/2025 Housing Court Order says that she [Tamarra Haynes] has to be let in by 3:00 p.m. today. Yuri Starikov confirms that she [Tamarra Haynes] is let in, but not other individuals, because Sharon Smitherman-Roach represents a threat to other residents of the building. Yuri Starikov reiterates to officers "no problem, she [Tamarra Haynes] is in, she has a minor child, minor child can come in." John Ortega responds that "you [Yuri Starikov] cannot dictate who comes in or not." Yuri Starikov replies "Yes, I can sir, because we've been threatened." John Ortega shakes his head.

87. On or about 3:46 p.m., John Ortega states: "Here is my problem. Do you have anything stating that she [Sharon Smitherman-Roach] can't come here?" Yuri Starikov points to the building rules of conduct and trespass sign posted on the front door. Yuri Starikov further states that "I have an order of possession from the courthouse and the only thing that keeps her [Tamarra Haynes] here is because she came [to the housing court] begging for a stay." Yuri Starikov emphasized that "she [Tamarra Haynes] got a stay, not this lady [Sharon Smitherman-Roach], not this man, who I don't know who he is" pointing out the respective individuals. "She [Tamarra Haynes] can come in, she has a minor child, no problem. But, she [Tamarra Haynes] has been bringing threatening individuals who come and state that they will kill me. I am not going through this again. And this woman, this woman right there [pointing to Sharon Smitherman-Roach] she just stated that she will come here every day and start harassing my wife and me."

88. On or about 3:55 p.m., John Ortega returns and continues the dialogue with Yuri Starikov along the same lines: "you cannot control who comes in and out here." Yuri Starikov responds "I can." John Ortega: "You cant' though. * * * You can't though, that's what I am telling you, you are not legally allowed to do that." Yuri Starikov responds: "I own this building." John Ortega: "That's her apartment, she owns that apartment." Yuri Starikov: "She does not own this apartment, I own this apartment." John Ortega: "By law, she is a resident, that's her abode, she can have guests over." Yuri Starikov: "No, she is an occupant." John Ortega: "Which is the same exact thing." Yuri Starikov: "No." John Ortega "Yes,* * * this is her apartment." Yuri Starikov: "this is not her apartment guys, we have the deed." John Ortega: "Do you want me to call my

supervisor to explain this to you?" Yuri Starikov: "I don't need to, because I am a lawyer." John Ortega: "It does not matter." Yuri Starikov: "I know what I am talking about."

89. On or about 4:03 p.m., Yuri Starikov demonstrates the incorrect NYPD's position on "unfettered access" to Anthony Martella, Patrick Ohalloran, and Michael Davies. To that end, Yuri Starikov brings out a lease agreement executed between Seawest, LLC and Haynes, whereas she agrees to follow the building rules of conduct and "such other and further rules or regulations as may be hereafter made by Landlord." Just minutes earlier, Patrick Ohalloran and Michael Davies were examining building rules of conduct and trespass laws that restrict visiting privileges to occupants.

90. On or about 4:12 p.m., Darren Johansen confirmed NYPD's "non-resident visitor unfettered access policy" by ordering the arrest of Yuri Starikov. Darren Johansen stated to Tamarra Haynes: "so you can enter." John Ortega added: "and her guest as well." Darren Johansen confirmed: "and her guest as well." Yuri Starikov responded: "no, guests are not coming through." Darren Johansen stated: "sir, that's an illegal eviction * * * you are under arrest, that's it. It's illegal eviction, you are under arrest sir." John Ortega tightly placed handcuffs on Yuri Starikov.

91. After John Ortega placed handcuffs, Darren Johansen announced his logic: "you are stating that she cannot bring in her lawful guests." Seconds after ordering the arrest of Yuri Starikov, Darren Johansen further stated: "that is not anywhere written that she cannot bring guests to her lawful residence."

92. Darren Johansen had building rules of conduct and trespasser sign right in front of him posted on the door stipulating restrictive policies by Seawest, LLC upon non-resident private visitors. Yet, Darren Johansen failed to make inquiries about visitor restrictions policies by Seawest, LLC, prior to and after the arrest. Anthony Martella, Patrick Ohalloran, and Michael Davies, who were informed about the legal basis of visitor restrictions, stood silently nearby, again failing to correct Darren Johansen's incorrect statements.

93. Elliot Richardson walked handcuffed Yuri Starikov away to an NYPD vehicle stating: "You can't stop a tenant from having guests." Yuri Starikov responded: "no, with threats, I have a right to safety."

### *D(v). Post-Arrest Injuries and Trauma*

94. John Ortega and Anthony Martella drove Yuri Starikov to NYPD's 101st Precinct. Yuri Starikov's hands were numb. After handcuffs were removed, Yuri Starikov continued to experience numbness in his right hand, which later subsided. The numbness in his left hand, however, remained. The left hand was showing signs of swelling.

95. Yuri Starikov requested medical attention from both John Ortega and Anthony Martella.

96. John Ortega initially refused medical attention stating that Yuri Starikov reported to the desk sergeant as having no injuries. It took multiple requests to actually receive medical attention. Yuri Starikov responded that he expected numbness to go away with time, because tightness of the handcuffs restricted the blood flow. After tightly placed handcuffs were removed, Yuri Starikov expected that blood flow would be normalized and numbness to go away. Yet, while numbness in the right hand went away, the swelling and numbness in Yuri Starikov's left hand continued.

97. Eventually, EMS personnel entered the holding cell, where Yuri Starikov demonstrated the visible swelling and described continued numbness in his left hand. EMS personnel took Yuri Starikov to St. John's hospital for further evaluation.

98. By the time of arrival to St. John's hospital – on or about 7:54 p.m. – Yuri Starikov's physical condition continued to deteriorate.

99. At St. John's, medical personnel administered a blood pressure test, with the initial top-level digit exceeding 200. After retaking the blood-pressure test several times, medical personnel recorded blood pressure at 188/122 on or about 8:05 p.m. This is a critically high and life-threatening results. Medical personnel immediately admitted Yuri Starikov and began administering blood pressure medication.

100. Until about 10:00 p.m., with short breaks for restrooms, blood pressure exam, and medication, NYPD officers kept Yuri Starikov's injured left hand handcuffed to his right hand behind his back. Yuri Starikov remained seated on a hard plastic chair, with his handcuffed hand placed against hard plastic backing, exacerbating the injury and pain.

101. On or about 9:04 p.m., medical personnel administered 5 mg. of amlodipine besylate reducing Yuri Starikov's blood pressure to 188/122 by 10:02 p.m. On or about 10:02 p.m., medical personnel administered another 5 mg. dose of amlodipine besylate. On or about 11:26 p.m., medical personnel administered 0.2 mg. clonidine tablet, further reducing the blood

pressure to 178/117 by 11:00 p.m. But, by 00:16 a.m. next day, Yuri Starikov's blood pressure elevated to 180/106, at which time medical personnel administered another 0.2 mg. clonidine tablet to Yuri Starikov.

102. During the visit, medical personnel took x-ray of Yuri Starikov's left hand, and found no broken bones, causing the emergency care physician to diagnose a nerve damage to the hand.

103. By 1:30 a.m., Yuri Starikov's blood pressure dropped to 142/96 and medical personnel discharged Yuri Starikov from St. John's shortly thereafter.

104. Yuri Starikov continues to experience numbness and pain in his left hand to this day. Following John Ortega's excessive handcuffing, he is unable to perform manual duties for Seawest, LLC, including maintenance and repair of the building.

105. Following the arrest, Queens District Attorney's Office instigated a full order of protection, rendering Yuri Starikov and Seawest, LLC incapable of carrying out their duties in securing the premises from threatening individuals, property damagers, squatters, and other bad actors.

106. To add insult to the injury, Sharon Smitherman-Roach returned the next day to the property, and demonstratively scratched Yuri Starikov's car, causing $600 damage to the vehicle.

***D(vi). Communications to Captain George Ng***

107. Yuri Starikov's wife wrote a series of empathetic letters to George Ng, bringing to his attention, *inter alia*, the false arrest by Darren Johansen and the reasons why the arrest was falsely made.

108. These letters were sent to George Ng on December 12, 2025, the day of the arrest by email. The follow-up letter was sent to George Ng on December 24, 2025 electronically, and by regular mail on December 26, 2025.

109. These letters provided opportunity to George Ng to speak to his subordinate officers, including Darren Johansen, about unlawful "non-resident visitor unfettered access" policy posture practiced within NYPD and recuse false statements made by Anthony Martella within the accusatory instrument.

110. Yet, George Ng maintained his silence, without any response electronically or otherwise.

## VIII. CAUSES OF ACTION

### COUNT I

**Plaintiff Yuri Starikov v. Defendants Darren Johansen, John Ortega, Anthony Martella, and Elliot Richardson, Patrick Ohalloran, Michael Davies, and George Ng**

**Federal Constitutional Claim – Violation of Fourth Amendment: False Arrest and Unlawful Imprisonment.**

111. Plaintiffs repeat and reallege paragraphs 1 through 110 hereof, as if fully set forth herein.

112. Darren Johansen, John Ortega, Anthony Martella, and Elliot Richardson intentionally confined Yuri Starikov.

113. Darren Johansen ordered the confinement. John Ortega placed handcuffs on Yuri Starikov. Anthony Martella and Elliot Richardson held Yuri Starikov with their hands in order to restrict his movement.

114. Yuri Starikov was conscious of confinement, as Darren Johansen explicitly stated "you are under arrest" several times, while John Ortega, Anthony Martella, and Elliot Richardson restrained Yuri Starikov movement through the use of handcuffs and use of their hands.

115. Yuri Starikov did not consent to the confinement and at all times insisted that he did not do anything illegal.

116. Darren Johansen, John Ortega, Anthony Martella, and Elliot Richardson did not have probable cause to confine Yuri Starikov, because at all times he cooperated with NYPD.

117. 12/12/2025 Housing Court Order, upon which Darren Johansen relied, is limited only to Tamarra Haynes.

118. Plaintiffs employ lawful protocols that lawfully allow them to restrict entry to private non-resident visitors such as Sharon Smitherman-Roach.

119. Anthony Martella and John Ortega were aware of plaintiffs' lawful protocols restricting entry to non-resident visitors.

120. Darren Johansen and Elliot Richardson ignored or wantonly disregarded plaintiffs' lawful protocols restricting entry to private non-resident visitors.

121. The confinement of Yuri Starikov was not otherwise justified.

122. Confinement initiated by Darren Johansen, John Ortega, Anthony Martella, and Elliot Richardson proximately caused the constitutional injury suffered by Yuri Starikov.

123. Patrick Ohalloran and Michael Davies were present during Darren Johansen's dialogue with Yuri Starikov.

124. Patrick Ohalloran and Michael Davies were aware of Plaintiffs' lawful protocols restricting entry to private non-resident visitors. The said officers were further aware that Tamarra Haynes has unrestricted access to her apartment.

125. Yet, Patrick Ohalloran and Michael Davies did not intervene, when Darren Johansen started to make code demands and threatening Yuri Starikov with arrest.

126. Patrick Ohalloran and Michael Davies inaction proximately caused the constitutional injury suffered by Yuri Starikov at the hands of their colleagues.

127. Captain George Ng, as commanding officer, was made aware of the false arrest on the day of the arrest and subsequently thereafter.

128. George Ng is also aware of unlawful practice of "non-resident visitor unfettered access policy" enforcement exercised by his subordinate officers.

129. George Ng inaction was paired with requisite awareness that a violation is occurring and failed to take steps preventing the said violation.

130. Inaction of George Ng proximately caused the constitutional injury suffered by Yuri Starikov at the hands of his subordinates.

## COUNT II

**Plaintiff Yuri Starikov v. Defendant John Ortega**

**Federal Constitutional Claim – Violation of Fourth Amendment: Excessive Force**

131. Plaintiffs repeat and reallege paragraphs 1 through 130 hereof, as if fully set forth herein.

132. John Ortega intentionally placed handcuffs on Yuri Starikov.

133. During the handcuffing, John Ortega applied unreasonable amount of excessive pressure, making handcuffs extra tight.

134. Yuri Starikov did not resist the arrest and followed arresting officers' instructions during their in-custody procedure.

135. John Ortega's excessive handcuffing was unreasonable in light of Yuri Starikov's cooperation with law enforcement.

136. John Ortega's excessive handcuffing damaged the nerve of Yuri Starikov's left hand, causing a permanent numbness, constant pain, and inability to perform manual tasks for Seawest, LLC.

137. John Ortega's excessive handcuffing constitutes the use of excessive force, proximately causing Yuri Starikov to suffer the constitutional injury.

## COUNT III

**All Plaintiffs v. Defendants The City of New York, New York City Police Department, Jessica Tisch, Darren Johansen, John Ortega**

**Federal Constitutional Claim – Violation of Fifth Amendment: Taking**

138. Plaintiffs repeat and reallege paragraphs 1 through 137 hereof, as if fully set forth herein.

139. NYPD maintains the policy, custom, or usage of providing and enforcing "non-resident visitor unfettered access," irrespective of landlords' or property owner's private rules and procedures.

140. NYPD policy, custom, or usage of "non-resident visitor unfettered access" is intentional, explicitly stated by John Ortega, confirmed and enforced by Darren Johansen to the detriment of Yuri Starikov and Seawest, LLC.

141. As a result of the said NYPD policy, custom, or usage, Plaintiffs can no longer guarantee and/or provide safety and quiet enjoyment to residents of the building affected by unwelcome non-resident visitors.

142. NYPD's policy, custom, or usage of "non-resident visitor unfettered access" denies Plaintiffs' control and ability to perform lawful duties within their own property.

143. NYPD's policy, custom, or usage of "non-resident visitor unfettered access" deprived Plaintiffs' of their property to the benefit of others: namely hostile non-tenant occupant Tamarra Haynes and persons she invites to the premises, including threatening individuals, property damagers, squatters, and other bad actors.

144. Application of NYPD's policy, custom, or usage of "non-resident visitor unfettered access" to Plaintiffs is intentional, direct, and therefore constitutes taking in violation of the Fifth Amendment.

## COUNT IV

**Plaintiff Yuri Starikov v. Defendants Anthony Martella, Darren Johansen, George Ng**

**Federal Constitutional Claim – Violation of Sixth Amendment: False Testimony**

145. Plaintiffs repeat and reallege paragraphs 1 through 144 hereof, as if fully set forth herein.

146. Anthony Martella manufactured criminal complaint, case No. CR-044728-25/QN, where under penalty of perjury, he testified that: "Deponent states that he is informed by the complainant, Tamara [*sic*] Haynes, that on the above-mentioned date, time, place of occurrence, which is her residence, the defendant, Yuri Starikov, prevented her from entering the residence."

147. Additionally, Anthony Martella testified that "Deponent further states that when he arrived at the above-mentioned location and asked the defendant multiple times to let the complainant in and the defendant refused entry every time."

143. Anthony Martella's statements in both paragraphs are factually false. Tamarra Haynes herself stated to Anthony Martella that she made entry and that Yuri Starikov provided her the code.

149. Furthermore, Anthony Martella did ask Yuri Starikov multiple times to let Tamarra Haynes in, and each and every time Yuri Starikov's response was the exact opposite of what Anthony Martella states in the criminal complaint.

150. Anthony Martella confirmed his understanding that Tamarra Haynes can enter at any time on record.

151. Anthony Martella knew that he was fabricating false information within the first two paragraphs of the criminal complaint.

152. Anthony Martella forwarded a perjured complaint to Queens District Attorney's Office, which initiated criminal proceedings.

153. Anthony Martella's false information is likely to influence a jury's decision during trial.

154. Anthony Martella's fabricated instrument accuses Yuri Starikov of being a Class A misdemeanor criminal.

155. Yuri Starikov is a duly licensed attorney in States of New York and New Jersey, as well as, a federally licensed U.S. Customs Broker.

156. Anthony Martella's false statements are designed to deprive Yuri Starikov of liberty due to potential jail sentence, as well as property, through a loss of licenses and the ability to earn income from the foregoing.

157. Anthony Martella's fabricated criminal complaint violates Yuri Starikov's Sixth Amendment right to fair trial.

158. Darren Johansen was the supervising officer at the scene of false arrest, and he ordered the arrest, thereby subjecting Yuri Starikov to Anthony Martella's fabricated statements. Darren Johansen and Anthony Martella were acting jointly, in concert and conspiracy, with malice, violating Yuri Starikov's rights to a fair trial.

159. Captain George Ng, as commanding officer, was made aware of Anthony Martella's false testimony through a series of letters by Yuri Starikov's wife.

160. George Ng inaction was paired with requisite awareness that a violation is occurring and he failed to take steps preventing the said violation.

161. Inaction of George NG proximately caused the constitutional injury suffered by Yuri Starikov at the hands of his subordinates.

## COUNT V

**All Plaintiffs v. All Defendants**

**Federal Constitutional Claim – Violation of Fourteenth Amendment: Procedural Due Process.**

162. Plaintiffs repeat and reallege paragraphs 1 through 161 hereof, as if fully set forth herein.

163. Defendants caused the institution of false charges against Yuri Starikov, thereby subjecting Yuri Starikov to a malicious prosecution in violation of plaintiff's due process rights under the Fourteenth Amendment of the U.S. Constitution.

164. John Ortega further demonstrated deliberate indifference to a serious medical need related to a swollen hand brought to his attention by Yuri Starikov.

165. New York State law does not offer adequate procedural protections accompanying deprivation of constitutionally protected interest in Plaintiffs' liberty and property.

166. Defendants with impunity disregard Plaintiffs' lawful policies adopted to protect the property from threatening individuals, property damagers, squatters, and other bad actors.

167. Defendants further punish Plaintiffs for their attempt to protect their property through instigation of false arrest, bodily harm, and causing the institution of full order of protection against Yuri Starikov, with threat of further criminal prosecution, in case he attempts to simply do his job and protect the property from threatening individuals, property damagers, squatters, and other bad actors.

168. "Non-resident visitor unfettered access" policy, custom, or usage violates Procedural Due Process rights of Plaintiffs under the Fourteenth Amendment of the U.S. Constitution.

## COUNT VI

**All Plaintiffs v. The City of New York, The New York City Police Department, Jessica Tisch**

**Federal Constitutional Claim – Violation of Fourteenth Amendment: Substantive Due Process**

169. Plaintiffs repeat and reallege paragraphs 1 through 168 hereof, as if fully set forth herein.

170. NYPD's "non-resident visitor unfettered access" policy, custom, or usage hits the very essence of private contract, where landlords and homeowners are able to manage the conduct within their buildings.

171. The policy encourages hostile occupants to continue with their bad acts, as well as, squatters to perform hostile take-overs of apartments rendering landlords and homeowners unable to provide a meaningful opposition.

172. Landlords and homeowners cannot call NYPD, because they will side with hostile occupants, trespassers, and squatters. Landlords and homeowners can hardly rely on the housing

court, because it is overwhelmed and takes years to achieve relief from hostile occupants, threatening individuals, property damagers, squatters, and other bad actors.

173. The only practical way to withstand NYPD's "non-resident visitor unfettered access" policy, custom, or usage is to pay ransom settlement money, as Yuri Starikov witnessed in the case of 167 Beach 27th Street property, where Deutsche Bank paid $7,000-$8,000 to each squatter as a condition of leaving.

174. However, such ransom payments are not possible for small landlords such as instant Plaintiffs. Small landlords are already overburdened with mortgages, insurance payments, property taxes, utilities, maintenance and regulatory compliance.

175. Instant Plaintiffs have been trying to evict Tamarra Haynes for nearly two years, during which her hostility made other good tenants leave, while Yuri Starikov is literally forced to fight to remain free.

176. Plaintiffs faced "non-resident visitor unfettered access" policy, custom, or usage from NYPD before and after the day of the false arrest. None of the NYPD officers, including supervisory officers (sergeants, lieutenants), were able to name a single legislative enactment that clearly supports NYPD's posture.

177. NYPD's "non-resident visitor unfettered access" policy, custom, or usage deprives landlords and homeowners of ability to control their buildings, ensure safety for its residents, provide and/or guarantee quiet enjoyment, and otherwise follow lawful private agreements.

178. In the case of instant Plaintiffs, the said policy, custom, or usage results in criminal stigma and physical injuries to Yuri Starikov.

179. NYPD's "non-resident visitor unfettered access" policy, custom, or usage represents an outrageous government action that is totally arbitrary and should shocks the conscience of this Court.

180. The City of New York, NYPD, and Commissioner Jessica Tisch, collectively encouraged or failed to supervise their subordinate officers and employees on the unlawfulness of the said policy, custom, or usage.

181. City of New York, NYPD, and Jessica Tisch encouraged or failed to educate lower ranking NYPD officers that "non-resident visitor unfettered access" policy, custom, or usage is arbitrary, capricious, and otherwise not according to any specific New York law.

182. City of New York, NYPD, and Jessica Tisch action or inaction proximately caused the violation of Plaintiffs' constitutional rights guaranteed under Due Process clause of the Fourteenth Amendment.

## COUNT VII

**Plaintiff Yuri Starikov v. Defendants The City of New York, The New York City Police Department, Jessica Tisch, George Ng, Darren Johansen, Anthony Martella, John Ortega**

**New York State Law Claim – Tort of Malicious Prosecution and Abuse of Process**

183. Plaintiffs repeat and reallege paragraphs 1 through 182 hereof, as if fully set forth herein.

184. Defendants commenced criminal proceeding against Yuri Starikov by making false arrest and manufacturing false criminal complaint.

185. Defendants sent fabricated false criminal complaint to Queens District Attorney's Office, which in turn initiated a criminal action against Yuri Starikov.

186. The proceeding lacks probable cause, because it is entirely based upon false testimony of Anthony Martella.

187. The proceeding was instituted with malice, as evidenced by vindictive bodily harm sustained by Yuri Starikov from John Ortega, and John Ortega's subsequent attempt to deny medical care. Yuri Starikov objected to John Ortega's insistence on application of "non-resident visitor unfettered access" policy, custom, or usage on numerous occasions, to John Ortega's displeasure, ultimately causing him to call Darren Johansen.

188. Malice was further evinced through Darren Johansen's demeanor, who failed to make required inquiries about building policies, falsely presuming that Tamarra Haynes has order of protection against Yuri Starikov, and under threat of arrest, made Yuri Starikov provide another copy of the code to Tamarra Haynes, despite one being provided to her earlier.

189. Defendants have no probable cause, because Yuri Starikov cooperated with police officers at all stages, took his time to explain the reasons for denial of entry to non-resident visitor Sharon Smitherman-Roach, and at no time denied entry to Tamarra Haynes and her son.

190. Therefore, Yuri Starikov sustained an injury under the tort of malicious prosecution and abuse of process at the hands of Defendants.

**COUNT VIII**

**Plaintiff Yuri Starikov v. Defendants Darren Johansen, Anthony Martella, John Ortega**

**New York State Law Claim – Intentional Infliction of Emotional Distress**

191. Plaintiffs repeat and reallege paragraphs 1 through 190 hereof, as if fully set forth herein.

192. Defendants' acts of false arrest, fabrication of false testimony, and infliction of bodily harm constitute extreme and outrageous conduct.

193. Defendants were informed that Plaintiff – also a managing agent for the building - was lawfully protecting his property from non-resident visitor Sharon Smitherman-Roach, in light of her prior bad acts, and informed Defendants about the reasons as to why it was lawful.

194. Defendants further read the compliance signs on the door and throughout the building informing entrants about building rules of conduct, status of Tamarra Haynes as an occupant, and the law of trespass.

195. Defendants also were informed that plaintiff is a licensed attorney, being a member of New York and New Jersey State Bars.

196. Defendants knew or should have known, that if arrested, they will jeopardize Plaintiff's professional license rendering him incapable to engage in the practice of law.

197. Defendants also knew or should have known, that if physically injured, Plaintiff will be unable to perform manual maintenance duties as a managing agent and superintendent for the building.

198. Defendants further knew or should have known, that if arrested, the Queens District Attorney's Office, will require imposition of the order of protection against Plaintiff, rendering him further incapable to protect the building against threatening individuals, property damagers, squatters, and other bad actors.

199. Armed with aforementioned actual or imputed knowledge, Defendants' arrest was made with intent to cause, or disregard of a substantial probability of causing, severe emotional distress.

200. Post-arrest in-custody hospital visit confirmed the fact of severe emotional distress through physical manifestation of life-threatening extremely high blood pressure, which took multiple administration of medication before the blood pressure finally subsided.

201. The nerve damage to the left hand resulting from extreme handcuffing, causing Plaintiff to live in the permanent state of pain, serves as a constant reminder of Defendants' unlawful practices.

202. Hand injury, high-blood pressure, false testimony, malicious prosecution, criminalization of lawful conduct, likelihood of professional licenses revocation, and standing full order of protection caused Plaintiff to suffer a severe emotional distress.

203. The severe emotional distress was proximately caused by Defendants' conduct or misconduct.

## COUNT IX

**Plaintiff Yuri Starikov v. Defendant John Ortega**

**New York State Law Claim – Battery**

204. Plaintiffs repeat and reallege paragraphs 1 through 203 hereof, as if fully set forth herein.

205. John Ortega made bodily contact with Yuri Starikov by placing handcuffs on the Plaintiff.

206. Extreme tightness of handcuffing by John Ortega was harmful and offensive in nature.

207. John Ortega intended to utilize extreme tightness, as a response to Yuri Starikov's rebuttal of John Ortega's insistence that Plaintiff must implement NYPD's "non-resident visitor unfettered access" policy, custom, or usage.

208. John Ortega's excessive handcuffing was a proximate cause for sustained damage to the nerve of Yuri Starikov's left hand, causing permanent numbness, pain, and inability to perform manual tasks for Seawest, LLC.

## COUNT X

**All Plaintiffs v. Defendants Darren Johansen, Anthony Martella**

**New York State Law Claim – Frivolous Conduct**

209. Plaintiffs repeat and reallege paragraphs 1 through 208 hereof, as if fully set forth herein.

210. Darren Johansen made threats of arrest notwithstanding the fact of Yuri Starikov's compliance with 12/12/2025 Housing Court Order.

211. Darren Johansen falsely accused Yuri Starikov of having a restraining order against him.

212. Darren Johansen failed to make inquiries about lawful conduct of Yuri Starikov and Seawest, LLC in denying entry to non-resident visitor Sharon Smitherman-Roach.

213. Darren Johansen falsely accused Yuri Starikov as blocking the doorway for Tamarra Haynes, notwithstanding multiple declarations by Yuri Starikov that Tamarra Haynes and her son are free to enter anytime.

214. Anthony Martella fabricated a criminal complaint in furtherance of Yuri Starikov's prosecution alleging material factual statements that are false.

215. Anthony Martella knew these statements to be false as he was a witness to the incident in the capacity of a responding police officer.

216. Darren Johansen's and Anthony Martella's actions were undertaken to harass or maliciously injure Yuri Starikov.

217. Darren Johansen's and Anthony Martella's conduct is frivolous within the meaning of 22 N.Y.C.R.R. §130-1.1(c).

218. Sanctions are appropriate upon said Defendants pursuant to 22 N.Y.C.R.R. §130-1.1(a),(b).

## IX. RELIEF SOUGHT

**WHEREFORE,** Plaintiffs request the following relief:

A. As to The City of New York. Declaratory relief, pursuant to 28 U.S.C. §§2201 *et. seq.*, staying pending state criminal prosecution against Yuri Starikov upon Anthony Martella's false criminal complaint, because if defendants are successful, Yuri Starikov will suffer irreparable injury of loss of his New York and New Jersey attorney licenses, and federal U.S. Customs Broker License.

B. As to all defendants. Injunctive relief, pursuant to 28 U.S.C. §§2201 *et. seq*., proscribing all defendants from further approval and enforcement of "non-resident visitor unfettered access" policy, custom, or usage, which forces owners and landlords of the multiple-dwelling walk-up apartments to provide unfettered access to their buildings to non-resident private visitors that were acting in bad faith or otherwise refused to follow lawful rules and policies of the building.

C. As to all defendants. Injunctive relief, pursuant to 28 U.S.C. §§ 2201 *et. seq*., proscribing all defendants from disregarding law of contract, building rules and regulations, and forcing landlords and building owners to admit private non-resident visitors that were refused entry for lawful reasons.

D. As to The New York City Police Department and Jessica Tisch. Declaratory relief, pursuant to 28 U.S.C. §§ 2201 *et. seq*., and subject to approval of this Court, requiring NYPD to update their Unlawful Evictions Patrol Guide with provisions that directs its officers to evaluate criteria before making determination against landlord and/or property owner as to whether or not a particular private non-resident visitor can or cannot be denied entry. The criteria should include factors including: (1) whether landlord and/or property owner retains <u>physical</u> entry control of his building via concierge service, secured entry protocols, doorman/security personnel, or other measures that prevent non-residents from unfettered entry or exit; (2) whether landlord and/or property owner retains <u>legal</u> control on entry/exit of private non-resident visitors by way of building rules of conduct, trespasser signs, lease agreement and addendums thereto, and other legal documents; (3) whether private non-resident visitor can be viewed as a potential squatter seeking to establish occupancy rights under New York City's 30-day rule; (4) whether private non-resident visitor has a history of breaching peace, making threats, engaging in property damage, or commission of other acts towards landlord, property owner, their representatives, or other residents of the building that can make his or her visit incompatible with warranty of peaceful enjoyment of the premises. If one or more of these factors are in the affirmative, NYPD should <u>not</u> resort to arresting landlords, property owners, or their representatives for denial of entry to a private non-resident visitor and refer the matter to a housing court.

E. As to The New York City Police Department and Jessica Tisch. Declaratory relief, pursuant to 28 U.S.C. §§ 2201 *et. seq*., and subject to approval of this Court, requiring NYPD to update their handcuffing protocols, where non-violent suspects in NYPD custody that complain of

hand injury/injuries are not handcuffed with their hands behind their backs, and/or are not forced to remain seated against the hard surfaces, while their hand(s) are handcuffed behind them, potentially exacerbating their injury/injuries.

F. As to all defendants. Compensatory damages.

G. As to Anthony Martella, John Ortega, and Darren Johansen. Punitive damages, as their acts and omissions were made with bad faith and malice, as determined by the jury.

H. As to Darren Johansen and Anthony Martella. Sanctions, costs in the form of reimbursement for actual expenses reasonably incurred and reasonable attorney's fees, resulting from frivolous conduct under 22 N.Y.C.R.R. Part 130.

I. As to all defendants. Costs and interest.

J. As to all defendants. Reasonable attorney's fees, pursuant to Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C §1988.

K. Such other and further relief as this Court may deem appropriate and equitable.

Dated: West Hempstead, New York
March 9, 2026

Law Office of Yuri Starikov, LLC
*Attorneys for Plaintiffs*

By: Yuri Starikov

Yuri Starikov
511 Hempstead Ave., Ste. #209
West Hempstead, NY 11552
Tel. (347) 871-2759
Email: yuri@starikovlaw.com